538 S.E.2d 672

**BARNACLE BROADCASTING, INC., Respondent,**

v.

**BAKER BROADCASTING, INC., Appellant.**

No. 3252.

Court of Appeals of South Carolina.

Heard Sept. 13, 2000.

Decided Oct. 9, 2000.

Rehearing Denied Jan. 8, 2001.

John P. Linton, Julie O. Medich, and Martin C. McWilliams, Jr., all of Sinkler & Boyd, of Charleston; and W. Brantley Harvey, III, and Thomas A. Holloway, both of Harvey & Battey, of Beaufort, for appellant.

James C. Gray, Jr., and Elizabeth Scott Moise, both of Nelson, Mullins, Riley & Scarborough, of Columbia; and V.M. Manning Smith, of Moss & Kuhn, of Beaufort, for respondent.

HUFF, Judge:

In this declaratory judgment action, Baker Broadcasting, Inc. appeals the trial court's determination that Baker's Asset Purchase Agreement with Barnacle Broadcasting, Inc. was an option contract and the option had terminated entitling Barnacle to the return of the assets. We reverse and remand.

## FACTUAL/PROCEDURAL BACKGROUND

On April 27, 1995, Baker entered into an Asset Purchase Agreement (referred to by the parties as the APA) with Barnacle to purchase the assets of a radio station owned by Barnacle. On the same day, the parties entered into a Local Programming and Marketing Agreement (referred to as the LMA) that authorized Baker to operate the radio station. The purchase price under the APA was $1,225,000. Upon the execution of the APA, Baker paid Barnacle $100,000 as an earnest money deposit. Baker was to pay the remainder of the purchase price at closing.

The sale and purchase of the station was subject to approval by the Federal Communications Commission (FCC). The APA contained a covenant that Baker and Barnacle would "file with the FCC on or before January 1, 1996, an application and such other documents ... as may be necessary or advisable to obtain FCC approval of the Assignment of License from

[Barnacle] to [Baker]." The closing for the APA was to take place within thirty days of the FCC consent "or such other time as the parties may mutually agree...." The APA listed several events for termination of the agreement including termination upon "[w]ritten notice of Buyer to Seller at the earlier of the following: (a) the end of twelve (12) months following the effective date of the LMA; or (b) April 30, 1996, that Buyer, in its sole discretion, has elected to terminate this Agreement." If Baker terminated pursuant to this provision, Barnacle was to retain the $100,000 earnest money deposit.

The term of the LMA commenced on May 1, 1995. Unless otherwise terminated, the LMA was to end on the earlier of April 30, 1998 or the closing of the sale of the station pursuant to the APA. In the event the LMA was terminated prior to the closing under the APA, the termination would result in the termination of Baker's obligations and liabilities under the APA.

Due to technical difficulties, Baker did not begin broadcasting until late June and was unable to run commercials until early July. The parties did not file the FCC application by January of 1996 as provided in the contract.

By letter dated February 19, 1997, Barnacle stated the APA had terminated because the FCC assignment application had not been filed on or before January 1, 1996. Barnacle inquired whether Baker was still interested in buying the station under a new agreement. Baker responded that the APA was in full force. It attached a formal opinion letter drafted by its FCC attorney. It informed Barnacle that it was instructing its attorney to file the paperwork for the FCC assignment in the third week of April. Baker asserted they would close the transaction, subject to FCC approval, between August 15 and September 30, 1997, as the parties had previously discussed.

In response, Barnacle asserted that the APA was not enforceable by either party. Barnacle stated, "I believe my legal position is quite clear and sound. What is less clear is how much may I, in good conscience, take advantage of it." On March 7, 1997, Baker sent Barnacle the assignor's part of the FCC application. It asked Barnacle to review the document and send it to Baker's FCC attorney who already had its

part of the form. Baker informed Barnacle that it planned to immediately file the FCC documents. On March 27, 1997, Barnacle gave Baker a list of options to consider. The options included (1) Baker taking the $100,000 back and tearing up the APA, (2) Baker purchasing the station without the tower for $1.5 million and leasing the antenna and transmitter sites, (3) purchasing the station with the land and tower, but without the proceeds of any tower leases in place before transfer of the license, (4) purchasing the station, land and tower, including the leases, for $2,000,000 in addition to a percentage of the cash flow of the leases, or (5) suing Barnacle for specific performance. On April 4, 1997, Baker's attorney sent Barnacle a letter indicating they had not received the assignor's portion of the FCC application from Barnacle, and enclosed another copy of the assignor's part. The attorney asserted Baker was standing ready, willing and able to file the application with the FCC and to close on the sale after receiving the appropriate FCC authorization.

On April 22, 1997, Barnacle filed the present action seeking a declaratory judgment that the APA was no longer enforceable. Baker asserted counterclaims for specific performance and breach of contract, and sought punitive damages.[1]

The trial court held the APA was an option contract, which must be strictly construed against Baker and requires exact compliance with its terms. It found the FCC filing was the invoking event that would alert Barnacle that the option was being exercised and that the option, when exercised, would result in a bilateral contract. It found the option should have been exercised by Baker on January 1, 1996 because time is of the essence in an option contract. However, the court held Barnacle waived strict compliance by letting January 1, 1996 pass without taking any action when the option was not being exercised. The court further held time again became a condition of the contract and the extended delay justified the termination of the contract. Accordingly, it declared the option was terminated.

---

1. The trial judge struck the request for punitive damages. Baker does not appeal his ruling in this regard.

## LAW/ANALYSIS

### Standard of Review

The characterization of a declaratory judgment suit depends on the nature of the underlying controversy. *Felts v. Richland County*, 299 S.C. 214, 383 S.E.2d 261 (Ct.App.1989), *aff'd* 303 S.C. 354, 400 S.E.2d 781 (1991). In order to determine the standard of review to apply, we must look to the kind of action in which the issue involved would have been decided if there were no declaratory judgment procedure. *Id.* Both Baker and Barnacle assert this action involves interpretation of a contract and, as such, is an action at law. *See Jacobs v. Service Merchandise Co.*, 297 S.C. 123, 375 S.E.2d 1 (Ct.App. 1988) (noting that an action to construe an unambiguous written contract is one at law). In an action at law, tried without a jury, our scope of review extends merely to the correction of errors of law. *Crary v. Djebélli*, 329 S.C. 385, 496 S.E.2d 21 (1998). Thus, the trial court's factual findings will not be disturbed on appeal unless a review of the record discloses that there is no evidence which reasonably supports the judge's findings. *Id.; Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976).[2]

### DISCUSSION

Baker asserts the trial court erred in holding the APA was an option contract.

"The cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties." *Chan v. Thompson*, 302 S.C. 285, 289, 395 S.E.2d 731, 734 (Ct.App.1990). In determining the intention of the parties, a court first looks to the language of the contract and if the

---

2. We note that Baker counterclaimed for specific performance of the contract. An action for specific performance lies in equity and, in reviewing such an action, the appellate court may find facts in accordance with its own view of the preponderance of the evidence. *See Parker v. Shecut*, 340 S.C. 460, 531 S.E.2d 546 (Ct.App.2000). Because both Baker and Barnacle agree this is an action at law, we treat it as such and review the case under the more stringent law standard. Further, we conclude the factual findings of the judge must be reversed under both an "any evidence" law standard as well as a "preponderance of the evidence" equity standard.

language is clear and unambiguous, the language alone determines the contract's force and effect. *C.A.N. Enterprises, Inc. v. South Carolina Health & Human Servs. Fin. Comm'n,* 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988); *Conner v. Alvarez,* 285 S.C. 97, 101, 328 S.E.2d 334, 336 (1985).

 The supreme court recently set forth the three main characteristics of option contracts:

> (1) they are unilateral contracts where the optionor, for a valuable consideration, grants the optionee a right to make a contract of purchase but does not bind the optionee to do so; (2) they are continuing offers to sell, irrevocable during the option period; and (3) the transition of an option into a contract of purchase and sale can only be effected by an unqualified and unconditional acceptance of the offer in accordance with the terms and within the time specified in the option contract.

*Ingram v. Kasey's Assocs.,* 340 S.C. 98, 108, 531 S.E.2d 287, 292 (2000). Option contracts are strictly construed in favor of the optionor and against the optionee. *Id.* "Furthermore, if the option requires performance in a certain manner, time is of the essence and exact compliance with the terms of the option are required." *Id.* at 108, 531 S.E.2d 287.

 The primary test as to the character of a contract is the intention of the parties, such intention to be gathered from the whole scope and effect of the language used. *Greenwood Mfg. Co. v. Worley,* 222 S.C. 156, 71 S.E.2d 889 (1952). A review of the APA, as well as the LMA, reveals the APA is not a typical option to purchase contract. Rather, it appears the parties intended, by the APA, to create a contract for the sale and purchase of the assets of the radio station, with a provision allowing Baker to terminate the agreement within a specified time period. The contract was to continue in full force and effect if Baker failed to terminate it within that time. The APA is a contract of sale with an option to terminate, rather than an option to purchase within a specified time period. Further, the APA did not require Baker to make an "unqualified and unconditional acceptance" of an offer within an option period to create a bilateral contract of sale. Rather, under the APA, Baker had the option to terminate the APA by sending written notice of the election to Barnacle by April

30, 1996. Baker did not send written notice of termination within the time period it was allowed to terminate. Thereafter, the APA continued as a bilateral agreement between the parties.

Furthermore, even if we were to agree with the master that the APA is an option contract, we find no evidence the parties intended for the filing of the FCC application to be the invoking event for Baker to exercise an option to create a bilateral contract. The APA provided the parties would file the FCC application on or before January 1, 1996. The parties logically could not have intended January 1, 1996 to constitute the last day for Baker to accept an offer creating a bilateral contract when the APA gave Baker the right to unilaterally terminate the contract until April 30, 1996.

The filing of the FCC application was clearly a covenant of the contract. As the trial court held, however, Barnacle waived strict compliance with the January 1, 1996 filing date.[3] We also note the waiver of exact compliance with the filing date was not tantamount to the contract becoming a disfavored "perpetual contract." Pursuant to the terms of the APA, if closing had not previously occurred, at the latest the APA was to terminate upon the termination of the LMA on April 30, 1998.

Finally, under the terms of the APA, Barnacle was allowed to terminate the contract based on Baker's failure to timely fulfill a material covenant of the contract only if, after twenty days of written notice, Baker had not cured or satisfied the condition. Barnacle informed Baker on February 19, 1997 it was terminating the APA due to the failure to file the FCC application. Baker immediately responded that it intended to proceed with the closing. On March 7, 1997, Baker sent

---

**3.** The president of Baker, Frank Baker, testified he and the president of Barnacle, Pegram Harrison, discussed the technical problems and closing at a later date, and Barnacle was agreeable as long as payments continued under the agreements. Harrison admitted that after the January 1 date passed, he asked Baker when it was going to close and was informed by Baker that the closing would be that summer. He testified he was agreeable with a later closing date as long as Baker assured him they would be closing soon. When he finally became concerned Baker would be unable to close, Harrison wrote the February 1997 letter.

Barnacle the assignor's portion of the application and stated it had sent its portion of the application to the FCC attorneys. Harrison stated it is customary for the assignee to complete its portion first because the assignor has an obligation to the FCC to ensure that the assignee is a valid assignee. However, Barnacle never requested a copy of Baker's part of the application. Rather, it continued in its course of claiming the APA was no longer in effect. We find Baker fulfilled its responsibility for filing the FCC application and effectively cured any default. Accordingly, Barnacle could not validly terminate the contract.

We conclude the contract remained in full force when Baker asserted it was ready to file the FCC application and close the transaction, pending FCC approval. We remand the matter to the trial court for consideration of Baker's counterclaims in conformity with this court's opinion.

**REVERSED AND REMANDED.**

GOOLSBY and ANDERSON, JJ., concur.