656 S.E.2d 775

**LOWCOUNTRY OPEN LAND TRUST, Respondent,**

v.

**CHARLESTON SOUTHERN UNIVERSITY, Appellant.**

No. 4336.

Court of Appeals of South Carolina.

Heard Nov. 7, 2007.

Decided Jan. 16, 2008.

400

402

Stephen L. Brown and Edward Buckley, Jr., both of Charleston, for Appellant.

G. Dana Sinkler, of Charleston, for Respondent.

KITTREDGE, J.

Charleston Southern University (the University) and Low-country Open Land Trust (Buyer) entered into a contract for the sale and purchase, respectively, of real property in Dorchester County, South Carolina. The University is the principal, but not sole, owner of the real property. The University attempted to terminate the contract, resulting in an action by Buyer for specific performance. The master-in-equity rescinded the University's purported termination of the contract and ordered the parties to renegotiate their contract and enter into a "written extension agreement." The purpose of the extension agreement was to provide additional time within which to ascertain the varying ownership interests of the multiple property owners. The University appeals. We affirm the master only insofar as the University's interest in the property is concerned. We reverse that portion of the order requiring the parties to renegotiate their contract. The result of our holding is to grant specific performance as to the University's undivided interest in the property.

## I.

The University and Buyer entered into the contract on October 27, 2004, for approximately 63.38 acres of land located near Summerville in Dorchester County, South Carolina. The University represented that it owned 61.70% of the property, and provided the Buyer a list of twenty-seven other institutions and individual owners that it believed held the remaining interest.[1] The contract called for a total purchase price of $325,000, payable to each individual owner agreeing to the sale, including the University, in an amount to be determined in accordance with each owner's interest in the property.

Both the University and Buyer were aware of the unusual title and ownership issues. Therefore, the contract provided

---

1. There is some variation on this point as the record also contains a reference to twenty-eight other owners.

various options in the event Buyer was unable to obtain the complete ownership interest in the property. For example, in the event there were any deficiencies in title, Buyer could give notice to the University to cure such deficiencies. If the University was unable or unwilling to cure the claimed defects in title, or "in the failure of any Buyer's contingency described," Buyer could elect to cancel the contract or to "[a]ccept such title and/or condition of Property as [the University] can convey as performance in full." Thus, in the event Buyer was unable to obtain deeds conveying the full ownership interest from the remaining owners, Buyer could cancel the contract or take a deed from the University for its undivided interest in the property. Moreover, Buyer could purchase the interest of other property owners who would be willing to convey their ownership interest to Buyer. In this regard, to help determine title, the University agreed to contact the other owners and attempt to obtain their agreement to sell their interest in the property.[2]

The contract also included two timeline provisions: (1) an "Inspection Period," which was to last for sixty days from the October 29, 2004 delivery date of the contract; and (2) a "Title Examination Period," which was to begin on the expiration of the Inspection Period and continue until the thirtieth day thereafter. The contract further provided that the closing date should take place "on or before the expiration date of the Title Examination Period (or the first business day thereafter if such date shall be a Saturday, Sunday or legal holiday) at the office of Buyer's attorney, or at such other date or place as the parties may agree in writing." The parties agreed the Title Examination Period expired no later than January 31, 2005. Thus, the projected closing date was January 31, 2005. The contract did not include a "time is of the essence" provision.

Once the parties signed the contract, both the University and Buyer undertook efforts to verify the other owners of the property. On October 28, 2004, Buyer contacted Sidney Jones, a title abstractor, to perform the title search. Shortly

---

2. The contract expressly provided, however, that the University made no representation or warranty that it would, in fact, be able to deliver such agreements from the other owners.

after Jones received the order, Jones told Buyer that he could not complete the work in the time required due to his busy schedule and the number of owners he would have to research. Meanwhile, the University mailed a letter to all known owners asking for information as to how they acquired title to the property and seeking their consent to the sale of their property interest under the contract. On or about January 17, 2005, the parties discussed the status of consents the University had received from the other owners.[3] The projected closing date of January 31, 2005 passed without the parties closing on the contract.

On March 11, 2005, Sue Mitchell, Vice President for Business Affairs at the University, directed William Bates, the University's attorney, to check on the status of the contract so she could make a report to the University's Board of Trustees at the next scheduled board meeting. Bates contacted John Warren, III, Buyer's attorney, who advised Bates that Buyer was waiting for the completed title work. Later that same day, Warren e-mailed Bates requesting an extension of the contract. Bates forwarded the request to Mitchell, who in return directed Bates to issue a letter terminating the contract.

Bates sent a termination letter to Buyer on March 23, 2005. Buyer responded by filing this declaratory judgment action seeking specific performance on April 11, 2005. Notwithstanding the filing of this declaratory judgment action, on April 13, 2005, Bates delivered to Warren a copy of a Trust Agreement with respect to the property. The next day, Warren wrote to acknowledge receipt, stating he would forward the document to Buyer's title examiner and he hoped this would be "just what we have been looking for to help establish the current ownership."

On May 5, 2005, Buyer tendered a check to the University for $190,525 to purchase the interest owned by the University. The tendered check of $190,525 plus $10,000 in earnest money

---

3. According to a chart prepared by the University, as of January 17, 2005, ten people had sent completed information and signed consents to the sale of the property; one person had met with a University official; six people had no information about how they acquired their interest; three people referred the University to other sources; and seven people had not yet responded.

Buyer had previously paid equaled $200,525, which is 61.70% of the total purchase price of $325,000. The University did not accept the money and refused to quitclaim its interest in the property to Buyer.

The case proceeded to trial. In his final order, the master found (1) the contract did not include a "time was of the essence" provision, and (2) the University had waived its right to enforce the closing date based on its actions after January 31, 2005. As a result, the master rescinded the University's termination of the contract and ordered the parties to renegotiate an extension of the contract. The University appeals.

## II.

■■■■ Buyer filed a declaratory judgment action. "A suit for declaratory judgment is neither legal nor equitable, but is determined by the nature of the underlying issue." *Felts v. Richland County*, 303 S.C. 354, 356, 400 S.E.2d 781, 782 (1991). To make this determination, the appellate court must look to the essential character of the cause of action. *Barnacle Broad., Inc. v. Baker Broad., Inc.*, 343 S.C. 140, 146, 538 S.E.2d 672, 675 (Ct.App.2000). The character of the action is generally ascertained from the body of the complaint, but when necessary, "resort may also be had to the prayer for relief and any other facts and circumstances which throw light upon the main purpose of the action." *Ins. Fin. Servs., Inc. v. S.C. Ins. Co.*, 271 S.C. 289, 293, 247 S.E.2d 315, 318 (1978); *In re Estate of Holden*, 343 S.C. 267, 278, 539 S.E.2d 703, 709 (2000) (citing *Bell v. Mackey*, 191 S.C. 105, 119, 3 S.E.2d 816, 824 (1939) ("The nature of the issues as raised by the pleadings or the pleadings and proof, and character of relief sought under them, determines the character of an action as legal or equitable.")).

■■■■ In this case, Buyer primarily asserted a claim for specific performance.[4] An action for specific performance lies in equity. *Ingram v. Kasey's Assocs.*, 340 S.C. 98, 105, 531

---

4. On appeal, the Buyer asserts the master was interpreting the contract, so the action is one at law and this court's scope of review should extend only to the correction of errors of law. As previously discussed, although Buyer alleged a claim of breach of contract, the relief sought is specific performance. This is an action in equity.

S.E.2d 287, 290 (2000). In an appeal from an action in equity, tried by a judge alone, this court may find facts in accordance with its own view of the preponderance of the evidence. *Barnacle Broadcasting, Inc.,* 343 S.C. at 146, 538 S.E.2d at 675.

## III.

### A. Specific Performance

 The University claims the master erred in rescinding its termination of the contract because Buyer was not ready, willing, and able to perform its obligations under the contract on the closing date. We disagree insofar as the University's undivided interest in the property is concerned. We agree with the master that Buyer's failure to close on the projected closing date did not entitle the University to terminate the contract because time was not of the essence under the contract. It is well settled that time is not of the essence in a contract to convey land unless made so by its terms expressly or by implication. *Faulkner v. Millar,* 319 S.C. 216, 219, 460 S.E.2d 378, 380 (1995). "When the contract does not include a provision that 'time is of the essence,' the law implies that it is to be done within a reasonable time." *Id.* Under the circumstances presented here, Buyer had a reasonable time to complete performance of the contract.

The master's decision to rescind the University's termination of the contract is buttressed by other provisions in the contract and the conduct of the parties after January 31, 2005. For example, the contract included a provision allowing the parties to agree to an alternative closing date. Further, the conduct of the University after the projected closing date shows that the University did not believe time was of the essence. More than a month after the projected closing date, University Vice President Mitchell contacted Bates about the contract. Significantly, Mitchell contacted Bates to determine the status of the contract, not to declare a termination of the contract. It was only after Buyer requested a formal extension of the contract that the University advised Buyer that its delay under the contract entitled the University to terminate the contract. Additionally, even after this lawsuit was filed, the University's attorney provided documentation to Buyer's

attorney, which indicates there was a continuing effort to complete the transaction.

■ "[A] seller will not be permitted to declare a forfeiture of the rights of the buyer for nonperformance of any of the vital terms or conditions of the contract where such nonperformance has been with the express or clearly evinced tacit or implied consent of the seller." *Faulkner*, 319 S.C. at 221, 460 S.E.2d at 381. Accordingly, we find the University's communications and actions after January 31, 2005, demonstrate the tacit or implied consent of the University to Buyer's nonperformance.

■ By rescinding the University's termination of the contract, the master, in effect, granted Buyer specific performance. "In order to compel specific performance, a court of equity must find: (1) there is clear evidence of a valid agreement; (2) the agreement had been partly carried into execution on one side with the approbation of the other; and (3) the party who comes to compel performance has performed his or her part, or has been and remains able and willing to perform his or her part of the contract." *Campbell v. Carr*, 361 S.C. 258, 262, 603 S.E.2d 625, 628 (Ct.App.2004). The party seeking to compel specific performance "must be able to perform at the exact time he requested specific performance, not some 'reasonable time' in the future." *Ingram*, 340 S.C. at 106 n. 1, 531 S.E.2d at 291 n. 1.

The master found specific performance was appropriate as to the University's interest because Buyer attempted to close on the contract by waiving the title search and exercising its option under the contract to purchase only the University's interest. Paragraph 5 of the contract, entitled "Title Examination," provides in relevant part as follows:

Buyer shall examine title to the Property during the "Title Examination Period".... In the event there are any deficiencies in the title ... Buyer shall give written notice to [the University].... In the event that the [University] is unable or unwilling to cure any claimed defect in title to the Property, or in the failure of any Buyer's contingency described, the Buyer may elect either of the following as Buyer's sole and exclusive remedy ... i) Cancel the within Agreement ...; or ii) **Accept such title and/or condition**

**of Property as [the University] can convey as performance in full.**

(Emphasis added.)

Buyer unquestionably was willing and able to purchase the University's undivided interest in the property as evidenced by the tender of $190,525. Therefore, under the terms of the contract, Buyer could at its option forgo a title search, pay the University, and accept a quitclaim deed from the University. We concur in the master's grant of specific performance to the extent he required the University to convey its undivided interest in the property to Buyer.

 The University's final argument to defeat specific performance arises from its claim that the title examination was a condition precedent to its obligation to convey its undivided interest in the property. A condition precedent to a contract is "any fact other than the lapse of time, which, unless excused, must exist or occur before a duty of immediate performance arises." *Worley v. Yarborough Ford, Inc.*, 317 S.C. 206, 210, 452 S.E.2d 622, 624 (Ct.App.1994). "The question of whether a provision in a contract constitutes a condition precedent is a question of construction dependent on the intent of the parties to be gathered from the language they employ." *Id.* (internal quotation omitted).

We hold, as did the master, that the provisions concerning the title examination do not rise to the level of a condition precedent. As noted above, the contract extended Buyer certain options in the event of title deficiencies, including the right to "[a]ccept such title and/or condition of Property as [the University] can convey as performance in full." Buyer proceeded at its own peril in electing this bargained-for option under the contract and tendering to the University 61.70% of the purchase price in exchange for a quitclaim deed from the University.

Before moving to the next issue, we do recognize that much of the University's argument here centers on the varying interests of the other property owners. Clearly, the interests of the other property owners cannot be determined without a proper title examination. Buyer does not contend otherwise in the claim for specific performance against the University. As far as its rights under Paragraph 5 of the contract, Buyer

simply seeks to enforce its contractual right to "accept such title ... as [the University] can convey." As discussed below, we affirm the master's order only to the extent it grants specific performance to the University's undivided interest in the property.

### B. The Extension Agreement

■ The University contends the master had no authority to order the parties to enter into an undefined and indefinite extension agreement. We agree.

The master's order instructed the University to rescind its termination of the contract and for "both parties to execute an appropriate written extension agreement." What is "appropriate" is unknown. The purpose of the extension agreement concerned an undefined extension of time in which to determine the ownership interests of the remaining owners. It is one thing for a court to impose a reasonable time period in a contract (based on the particular facts presented) where time is not of the essence; it is quite another for a court to order the parties to enter into a new agreement. We are unaware of any legal authority, and none has been cited to us, permitting a court to order parties to renegotiate contract terms and enter into a new agreement.[5]

■ Courts only have the authority to specifically enforce contracts that the parties themselves have made; they do not have the authority to alter contracts or to make new contracts for the parties. *Amick v. Hagler*, 286 S.C. 481, 485, 334 S.E.2d 525, 527 (Ct.App.1985) (holding the trial judge properly granted specific performance, but did not have the authority to give one party the option of requiring the other party to provide owner financing because this was not part of the parties' contract).

■ Parties have the right to make their own contracts. *Torrington Co. v. Aetna Cas. & Sur. Co.*, 264 S.C. 636, 643, 216 S.E.2d 547, 550 (1975); *MailSource, LLC v. M.A. Bailey*

---

5. Moreover, it appears as of the time of trial Buyer had not determined the varying ownership interests of the multiple remaining owners. Thus, Buyer was in no position to perform under the contract even as late as the trial. Under these circumstances, we would decline to grant Buyer equitable relief with respect to the remaining property owners.

*& Assocs.,* 356 S.C. 363, 369, 588 S.E.2d 635, 638–39 (Ct.App. 2003) (stating, as a matter of first impression, that the appellate court would decline to adopt a procedure used in other jurisdictions that extended the non-compete period following a party's breach to ensure the nonbreaching party received the benefit of the bargain, the court stating there is no support for such an extension under South Carolina law because it would, in effect, rewrite the contract).

██ Succinctly stated, a court has no authority to rewrite a contract and impose unwanted obligations and terms under the guise of specific performance or judicial construction. Therefore, we reverse the portion of the master's order requiring the parties to renegotiate and enter into a new written extension agreement. *See, e.g., Lewis v. Premium Inv. Corp.,* 351 S.C. 167, 171, 568 S.E.2d 361, 363 (2002) ("It is not the function of the court to rewrite contracts for parties."); *E. Bus. Forms, Inc. v. Kistler,* 258 S.C. 429, 189 S.E.2d 22 (1972) (finding the court may not make a new agreement for the parties into which they did not voluntarily enter).

## C. Failure to Include Legal Authority

██ The University asserts the master's failure to support his conclusions of law with any legal authority is an error of law warranting reversal. We agree that the master failed to cite to any legal authority in his order. We do not find, however, that the lack of citation to legal authorities rises to the level of reversible error. This case was factually intensive, and the master's order discusses in detail the facts considered in making a decision to grant specific performance to Buyer of the University's undivided interest. While it may be unusual for a trial court not to cite legal authority to support its conclusions, the master generally discussed applicable legal concepts, such as whether time was of the essence in the contract, whether Buyer and the University acted in good faith, and whether the parties performed their obligations under the contract before concluding specific performance should be granted. We find no reversible error.

## IV.

We affirm the master's grant of specific performance as to the University's undivided interest in the property. We re-

verse the part of the order requiring the parties to execute a new written extension agreement. We therefore affirm the order requiring the University to convey its ownership interest to Buyer.

**AFFIRMED IN PART, REVERSED IN PART.**

HEARN, C.J., and THOMAS, J., concur.