717 S.E.2d 96

**Peter D. GRANT, Trustee, Appellant,**

v.

**STATE of South Carolina, Defendant.**

**No. 4870.**

Court of Appeals of South Carolina.

Heard May 3, 2011.

Decided Aug. 17, 2011.

226

J. Kirkland Grant, of Charleston, for Appellant.

J. Emory Smith, Jr., of Columbia, for Respondent.

LOCKEMY, J.

In this action to declare title to tidelands, Peter D. Grant, Trustee, (Grant) argues the trial court erred in concluding he failed to rebut the State of South Carolina's presumptive title to the tidelands adjacent to his property. We affirm.

## FACTS

Grant initiated this action against the State of South Carolina pursuant to section 48–39–220 of the South Carolina Code (2008) to determine ownership of the tidelands [1] adjacent

---

1. Section 48–39–220 defines tidelands as "all lands except beaches in the Coastal zone between the mean high-water mark and the mean low-

to his property. Grant's property, known as The Fort, is 3 acres of highland on the northwest side of the island of Folly Beach. Grant's property is bordered by approximately 9 acres of saltwater marsh. Grant claimed ownership of the marshland based upon a 1696 grant abstract and a 1786 surplus grant and plat. The State asserted it held prima facie fee simple title to the marshland in the public trust. After a bench trial, the trial court determined Grant failed to overcome the State's presumptive ownership and found the State held title to the marshland. This appeal followed.

## ISSUE ON APPEAL

Did the trial court err in determining Grant failed to rebut the State's presumptive ownership of the marshland adjacent to his property?

## STANDARD OF REVIEW

An action to determine ownership of tidelands pursuant to section 48–39–220 is an action at law. *See Query v. Burgess*, 371 S.C. 407, 410, 639 S.E.2d 455, 456 (Ct.App.2006). In an action at law, tried without a jury, our scope of review extends to the correction of errors of law. *Barnacle Broad., Inc. v. Baker Broad., Inc.*, 343 S.C. 140, 146, 538 S.E.2d 672, 675 (Ct.App.2000). Furthermore, "the trial court's factual findings will not be disturbed on appeal unless a review of the record discloses that there is no evidence which reasonably supports the [court's] findings." *Id.*

## LAW/ANALYSIS

The State of South Carolina holds presumptive title to all land below the high water mark in trust for the benefit of its citizens. *McQueen v. S.C. Coastal Council*, 354 S.C. 142, 149, 580 S.E.2d 116, 119 (2003). To rebut the State's presumptive title, a claimant must show (1) its predecessor in title possessed a valid grant, and (2) the grant's language was sufficient to convey land below the high water mark. *Lowcountry Open Land Trust v. State*, 347 S.C. 96, 103, 552

water mark of navigable waters without regard to the degree of salinity of such waters."

S.E.2d 778, 782 (Ct.App.2001); *State v. Holston Land Co.*, 272 S.C. 65, 66, 248 S.E.2d 922, 923 (1978).

 Because the State is presumed to hold title to tidelands in trust for the benefit of the public, a grant of private ownership must contain specific language in the grant or on the plat demonstrating an intent to convey land below the high water mark. *Hobonny Club, Inc. v. McEachern*, 272 S.C. 392, 396, 252 S.E.2d 133, 135 (1979). A grant which names a navigable tidal stream as a boundary conveys land to the ordinary high water mark. *State v. Pinckney*, 22 S.C. 484, 492 (1885). Title to land between the high and low water marks remains in the State and is held in trust for the benefit of the public. *State v. Hardee*, 259 S.C. 535, 539, 193 S.E.2d 497, 499 (1972). A grant of tidelands by the State or a predecessor sovereign is construed strictly in favor of the State and the general public and against the grantee. *Id.*

There is no dispute regarding the validity of Grant's chain of title. Thus, the issue before us is whether the grants and plat at issue are sufficient to convey land below the high water mark.

## I. The 1696 Grant

 Grant argues the trial court erred in determining the 1696 grant did not convey the whole of Folly Island including the adjacent tidelands. We disagree.

Grant established a chain of title to a 1696 grant of Folly Island from the Lords Proprietors to William Rivers. The original grant and plat are not known to exist and the record contains only the grant abstract which states:

William Rivers had a grant out of the Secretary's Office for Seven Hundred Acres of Land or thereabouts which said Land in Situate in Berkeley County known by the name of Folly Island which butts and bounds Southeasterly on the Sea, Northwesterly on marsh and back of the Sound on South side of James, Northwesterly on a creek that comes out of the South Channel of Ashley River.

The grant abstract names only tidal navigable water ways as boundaries and contains no language indicating an intent to convey land below the high water mark. In fact, the only

mention of tidelands is the use of word "marsh" to delineate the northwest boundary of the property conveyed: "butts and bounds ... Northwesterly on marsh." *Black's Law Dictionary* 1080 (9th ed.2009) (defining "butts and bounds" as the territorial limit of real property, or in other words a boundary line). Such language is insufficient to convey land below the high water mark.

Grant submits that under English common law in 1696, the grant of an island conveyed the entire island including the adjacent tidelands.[2] We find Grant's contention without merit. In *Shively v. Bowlby* the Supreme Court of the United States noted:

> In England, from the time of Lord Hale, it has been treated as settled that the title in the soil of the sea, or of arms of the sea, below ordinary high-water mark, is in the king, except so far as an individual or a corporation has acquired rights in it by express grant, or by prescription or usage ... and that this title, jus privatum, whether in the king or in a subject, is held subject to the public right, jus publicum, of navigation and fishing. ...
>
> It is equally well settled that a grant from the sovereign of land bounded by the sea, or by any navigable tide water, does not pass any title below high-water mark, unless either the language of the grant, or long usage under it, clearly indicates that such was the intention.

152 U.S. 1, 13, 14 S.Ct. 548, 38 L.Ed. 331 (1894) (citations omitted). These rules were applied in South Carolina for the first time in *State v. Pacific Guano Co.*, 22 S.C. 50 (1884). There, the State sought to enjoin the Pacific Guano Company from mining phosphate from several tidal creek beds near Beaufort. *Id.* at 52. In determining the State held title to the creek beds at issue, the court noted: " 'It is a settled principle

---

**2.** In support of this contention Grant introduced expert testimony from Professor William Cook and the publication *Marsh Granting Practices in South Carolina* for the purpose of "interpretation of grants and plats and titles." Although the trial court allowed Grant to offer this evidence during the bench trial, the court ultimately excluded the evidence. Grant has not appealed this ruling; therefore it is law of the case. *See Charleston Lumber Co. v. Miller Hous. Corp.*, 338 S.C. 171, 174–75, 525 S.E.2d 869, 871 (2000) (noting an unchallenged ruling is law of the case).

of the English law that the right of owners of land bounded by the sea or on navigable rivers where the tide ebbs and flows, extends to high water mark; and the shore below common, but not extraordinary high water mark, belongs to the public.' " *Id.* at 79–80. The *Pacific Guano* court also noted the unique character of the State's title to tidelands:

> The state had in the beds of these tidal channels not only title as property, the *jus privatum,* but something more, the *jus publicum,* consisting of the rights, powers, and privileges derived from the British crown, and belonging to the governing head, which she held in a fiduciary capacity for general and public use; in trust for the benefit of all the citizens of the state, and in respect to which she had trust duties to perform.

*Id.* at 83–84. Because of the unique character of such lands, English common law and South Carolina law developed special rules regarding the granting of tidelands.

Under English common law, a grant of tidelands was to be "construed strictly[ ] and it will not be presumed, that the King intended to part from any portion of the public domain, unless *clear and special words* are used to denote it." *Martin v. Waddell's Lessee,* 41 U.S. 367, 406, 16 Pet. 367, 10 L.Ed. 997 (1842) (emphasis added). The *Pacific Guano* court outlined a similar rule: "In all grants [of tidelands] from the government to the subject, the terms of the grant are to be taken most strongly against the grantee, and in favor of the grantor." 22 S.C. at 86. Further, pursuant to English common law the upper boundary of tidelands was the "ordinary high-water mark." *U.S. v. Pacheco,* 69 U.S. 587, 590, 2 Wall. 587, 17 L.Ed. 865 (1864). Thus, when "the sea, or a bay, is named as a boundary, the line of ordinary high-water mark is always intended where the common law prevails." *Id.* The *Pacific Guano* court noted and applied the English common law rule to the creek beds at issue in that case: "These are all channels in which the tide ebbs and flows, and as to such the well established rule is, that a grant of the shore gives title only to the high water mark, the mean between extreme high and low tides." 22 S.C. at 79.

Grant's argument that *Trapier v. Wilson,* 13 S.C.L. (2 McCord) 191 (1822) stands for the proposition that a grant of

an island included the adjacent tidelands is misplaced. Our supreme court addressed *Trapier* in *State v. Pinckney*, 22 S.C. 484 (1885). After discussing the rules outlined above, the *Pinckney* court stated:

> By his great industry, the counsel for the defendants found and cited the case of *Trapier v. Wilson* (2 McCord, 191), which he urged had changed the rule[s regarding grants of tidelands]. That was a contest between John T. Wilson and Paul Trapier as to whether there was any vacant land on " 'North Island'—meaning vacant highlands. The case itself states that "the question was whether the grant to Laroche (under which Mr. Trapier claimed) covered the whole of the island except the salt water marsh, or was it to be located according to the courses and distances set forth in the plat?" It was a simple question of location, the only point being whether the grant covered the upland of the whole island. It was held that the whole island was covered by the grant, and from this it is sought to draw an inference that the court held the doctrine that Trapier, as riparian proprietor, had title down to low-water mark. We cannot perceive that any such decision was involved in the case. The doctrine we are considering was not broached, and neither the common law rule nor the words "high" or "low-water" mark were referred to in the opinion. Judge Richardson, in delivering the judgment, again excepts the marshes. He says: "By the description set forth in the grant, the location is plain and unquestionable. The whole island (unless the marsh be so called) is clearly within it." It seems that in those days, before the discovery of phosphates, salt marsh went for nothing.

22 S.C. at 508. In sum, we find no merit to Grant's contention English common law provided that a grant of an island included the adjacent tidelands. Because the 1696 grant abstract lacks any indication of an intent to convey land below the high water mark, we find the trial court's determination Grant failed to rebut the State's presumptive title is supported by evidence in the record.

## II. The 1786 Grant and Plat

▉ Grant argues the trial court erred in determining the 1786 surplus grant did not convey the tidelands at issue. We disagree.

Included in Grant's chain of title is a 1786 surplus grant from the State of South Carolina to Martha Samways. The grant states:

We have granted, and by these Presents do grant unto the said Martha Samways her Heirs and Assigns, a Plantation or Tract of Land containing one thousand nine hundred forty acres being the surplus contained in grant for the Folly Island heretofore granted to William Rivers on the 9th of September 1696 for seven hundred acres or thereabouts but upon a Resurvey found to contain within the lines of the same two thousand six hundred and forty having such shape, form, and marks, as are represented by a plat hereunto annexed, together with all woods, trees, waters, watercourses, profits, commodities, appurtenances, and hereditaments, whatsoever thereunto belonging; To have and to hold Said Tract of one thousand nine hundred and forty Acres of Land, and all and singular other the premises hereby granted unto the said Martha Samways her Heirs and Assigns for ever, in free and common Soccage.

The grant also states Martha Samways paid forty-five pounds sterling for the surplus acreage. The surplus grant is accompanied by a hand drawn plat which describes the land surveyed as

an Island, situate in the District of Charleston, Granted to William Rivers the 9th September 1696 for the Folly Island, for Seven hundred acres, or thereabouts, but upon the said resurvey found to contain, within the lines of the same, two thousand, six hundred and forty acres, nineteen hundred and forty acres thereof being surplus, and hath such form, mark, buttings and boundings as the above plat represents.

The plat includes a drawing of Folly Island displaying the Atlantic Ocean to the southeast, the Folly River to the northwest, Bird Keys to the southwest, and Lighthouse Island to the northeast. The drawing also depicts marshland on the northwest side of Folly Island with a stippled pattern. Folly Island and the marshland are circumscribed by a line. The 1786 surplus grant and plat include no additional boundary description and instead refer to the 1696 grant.

Dr. Charles Lesser, a historian and archivist with the South Carolina Department of Archives and History, testified sur-

plus grants were used to convey additional land discovered to be within the boundaries of a prior grant upon a resurvey. According to Lesser, when a resurvey revealed more land existed within the boundaries of a grant than previously estimated, the owner could pay for the additional land and be granted the surplus.

Here, the 1696 grant abstract indicates the 1696 grant conveyed 700 acres "or thereabouts" known as Folly Island. The 1786 surplus grant and plat state Folly Island was resurveyed and determined to be 2,640 acres. The 1786 surplus grant conveyed the difference between the 700 acres granted in the 1696 grant and the 2,640 acres discovered by the resurvey. In other words, the 1786 surplus grant conveyed the 1,940 acres found to be within the lines of the 1696 grant upon a resurvey. By definition the 1786 surplus grant could not convey land outside the boundaries of the 1696 grant. *See Thomson v. Gaillard,* 37 S.C.L. (3 Rich.) 418, 421 (1832) (defining a surplus grant as a "grant within the lines of an elder one"). Accordingly, we conclude the trial court's determination that the 1786 surplus grant conveys only the extra acreage discovered within the boundaries of the 1696 grant is reasonably supported by the evidence in the record.[3]

Assuming the 1786 surplus grant and plat could convey additional acreage outside the boundaries of the 1696 grant, nothing in either the grant or the plat indicates an intent to convey tidelands. In fact, the stated acreage in the grant and the high land acreage depicted on the plat indicate the opposite. The 1786 surplus grant states the land conveyed in the 1696 grant was resurveyed and found to be 2,640 acres. The State presented the expert testimony of surveyor Frederick Quinn who calculated the high ground acreage depicted on the 1786 plat using two methods: a computer scan and a

---

3. Grant argues the 1786 surplus grant and plat conveyed vacant lands, which included the tidelands at issue, pursuant to the Act of 1784, 4 Stat. 627, No. 1206. Grant draws support for this assertion from the 45 pounds Martha Samways paid for the 1,940 acres conveyed by the 1786 surplus grant. However, the Act expressly states vacant lands are to be sold for the sum of 10 pounds per 100 acres. If the 1,940 acres conveyed in the 1786 surplus grant was for vacant land, Martha Samways would have paid 194 pounds. Thus, Grant's argument in this regard is without merit.

planimeter. Quinn's computer scan calculation indicated the high ground was 2,596 acres, while the planimeter calculation indicated the high ground was 2,610 acres. Grant's expert surveyor, Thomas Bessent, also calculated the high ground acreage and determined it was approximately 2,614 acres. Bessent explained his figures agreed with Quinn's "very closely" and were "well within expected tolerance." The high degree of similarity between the acreage stated in the grant and the acreage of high ground depicted on the plat indicate an intent to convey only the high ground.

 Grant argues the line circumscribing Folly Island and encompassing the tidelands at issue on the 1786 plat evidences an intent to convey the tidelands at issue. Strictly construing the grant and plat in the State's favor, more is required.

In *State v. Holston Land Co.,* our supreme court found the plat at issue evinced an intent to convey land below the high water mark. 272 S.C. 65, 68, 248 S.E.2d 922, 924 (1978). There, the plat's legend indicated the property conveyed was a 200 acre tract of marshland. *Id.* at 67, 248 S.E.2d at 923. The plat depicted the marsh with a stippled pattern across which was written "two hundred acres marsh[ ]land." *Id.* The plat also included several small islands and adjacent marsh with an accompanying legend stating "all pieces of marsh that[ are] commonly covered at high water." *Id.* at 67, 248 S.E.2d at 924. In *Lowcountry Open Land Trust v. State,* this court found a grant and plat were sufficient to convey land below the high water mark where the plat contained a surveyor's note which indicated a 1,102 acre tract of marshland was surveyed and the drawing of the tract included the word "marsh" on its face in two locations. 347 S.C. 96, 104–05, 552 S.E.2d 778, 782–83 (Ct.App.2001). Finally, in *Hobonny Club, Inc. v. McEachern* our supreme court found two "exceptional" plats were sufficient to convey the tidelands at issue. 272 S.C. 392, 398, 252 S.E.2d 133, 136–37 (1979). The court described the plats as follows:

> They are not mere maps on which boundary waterways are drawn in free-hand to represent directions and conformations of boundaries. These plats are carefully, scaled and platted so as to delineate the boundaries of the tracts granted with mathematical precision. It is undisputed that

the boundaries are accurately relocatable on the ground by contemporary engineering methods.

*Id.* at 398, 252 S.E.2d at 136. Because the plats were drawn with such a high degree of precision and encompassed tidelands, the court found the grant and plats were sufficient to convey the tidelands. *Id.* at 398, 252 S.E.2d at 137. Although the plat at issue here depicts tidelands, it lacks the other indicators of intent to grant land below the high water mark present in *Holston* and *Lowcountry Open Land Trust.* Additionally, in contrast to the plats in *Hobonny Club,* Grant's expert land surveyor, Bessent, testified the 1786 plat is poorly drawn and not capable of being relocated on the ground.

Finally, this court has previously determined a copy of the 1786 surplus grant and plat at issue in this case lacked the requisite intent to convey tidelands. In *Query v. Burgess,* Query brought suit against his neighbor Burgess and the State to determine title to tidelands adjacent to his property and Query's property on Folly Beach. 371 S.C. 407, 409–10, 639 S.E.2d 455, 456 (Ct.App.2006). The master examined a copy of the 1786 surplus grant and plat at issue here[4] and determined they lacked evidence of the State's intent to grant tidelands and concluded the State held title to the marsh. *Id.* at 412, 639 S.E.2d at 457. Query appealed. *Id.* at 410, 639 S.E.2d at 456. On review, this court noted "[t]he plat roughly delineates Folly Island ..., contains the bare bones of a survey[,] and is neither precise nor detailed." *Id.* at 412, 639 S.E.2d at 457. This court also noted the 1786 surplus grant and plat lacked any terms consistent with the intent to grant property below the high water mark and affirmed the master's finding.

For the foregoing reasons, we conclude the trial court's determination the 1786 surplus grant and plat lacked evidence of the requisite intent to convey tidelands is supported by evidence in the record.

---

4. The copy of the 1786 surplus grant and plat used in *Query* are substantively similar to the ones at issue here save one exception. The copy used in *Query* included a line dividing the marshland from the high ground in addition to the line circumscribing the high ground and the marshland.

## III. Grant's Remaining Issues

Grant argues the trial court erred in relying on *Query v. Burgess.* We find no improper reliance on *Query* and therefore decline to address the issue. *See* Rule 220(b)(2) (providing "[t]he [this court] need not address a point which is manifestly without merit."). Grant argues the trial court erred in adopting the State's revised proposed order without allowing him an opportunity to respond. We find this issue is not preserved for our review. *See Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("[A]n issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review.").

### CONCLUSION

For the foregoing reasons, the decision of the trial court is **AFFIRMED.**

FEW, C.J. and PIEPER, J., concur.