# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

H. Marshall Hoyler, Appellant,

v.

The State of South Carolina, Merry Land Properties, LLC, Sherbert Living Trust, Supan Living Trust, Elizabeth R. Levin, Edward McCray Wise Revoc. Living Trust, Carol Ann DeVries Wise Revoc. Living Trust, Amelie Cromer, Philip Cromer, Robert Chiavello, Tocharoen Living Trust, Helen M. Olesak, Lesley Anne Glick a/k/a Lesley Ann Glick, Shirley G. Lackey, Patricia Banfield, Bertrand Cooper, Jr., NHP SH South Carolina I, LLC n/k/a CCP Bayview 7176 LLC, Oyster Cove Homeowners Ass., Shirley Anne Moyer, Barry D. Malphrus, Garry D. Malphrus, Donnie Malphrus, Rita Brown, Houston Family Partnership, Joan Taylor Trustee, Michael Bull, Nancy Bull, Marny H. VonHarten, Dianne M. Donaldson, Brian R. Evans, Stephen Durbin, Valerie Durbin, Phillip Marti, Jane Marti, Michael Woodworth, Georgiana M. Cooke, Daniel B. Walsh Janet E. Walsh, Defendants,

Of which The State of South Carolina and Merry Land Properties, LLC are the Respondents.

Appellate Case No. 2016-001277

———————

Appeal From Beaufort County
Marvin H. Dukes, III, Master-in-Equity

———————

Opinion No. 5676
Heard March 4, 2019 – Filed August 7, 2019

———————

**AFFIRMED**

---

Jefferson D. Griffith, III, and Richard Lee Whitt, both of Austin & Rogers, P.A., of Columbia, for Appellant.

Mary Duncan Shahid and Angelica M. Colwell, both of Nexsen Pruet, LLC, and Stephen Peterson Groves, Sr., of Butler Snow, LLP, all of Charleston, for Respondent Merry Land Properties, LLC.

Attorney General Alan McCrory Wilson, Solicitor General Robert D. Cook, and Deputy Solicitor General J. Emory Smith, Jr., all of Columbia, for Respondent The State of South Carolina.

---

**GEATHERS, J.:**  Appellant H. Marshall Hoyler challenges an order of the Master-in-Equity denying his request pursuant to S.C. Code Ann. § 48-39-220 (2008) to declare that Hoyler holds title to 95.27 acres of tidelands along the Beaufort River and abutting the Town of Port Royal.[1]  Hoyler argues that this property is readily identifiable from the plat incorporated into the deed to his predecessor in title and, therefore, the master improperly considered extrinsic evidence.  Hoyler also argues the master erred by (1) allowing adjacent property owners to intervene in the action; (2) concluding the adjacent property owners had standing; (3) keeping the

---

[1] Section 48-39-220(A) provides,

> *Any person claiming an interest in tidelands*[,] which, for the purpose of this section, means all lands except beaches in the Coastal zone between the mean high-water mark and the mean low-water mark of navigable waters without regard to the degree of salinity of such waters, *may institute an action against the State of South Carolina for the purpose of determining the existence of any right, title or interest of such person in and to such tidelands* as against the State.

(emphases added).  The statute was amended in 2014, after Hoyler filed this action in November 2007, to reflect a change in the entity to receive service of process.

record open to allow Respondent Merry Land Properties, LLC (Merry Land) to submit additional testimony; and (4) declining to hear post-trial motions in a timely manner.  We affirm.[2]

## FACTS/PROCEDURAL HISTORY

In 2006, Merry Land purchased two tracts of land in the Town of Port Royal for the purpose of constructing a mixed-use development, including condominiums, with deep water access to the Beaufort River.  One of the tracts consists of eight acres with access to the Beaufort River via tidelands within which Hoyler claims ownership of 95.27 acres (the disputed marsh).[3]  Merry Land paid $4.5 million for

---

[2] We decline to address Merry Land's additional sustaining ground.  *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("It is within the appellate court's discretion whether to address any additional sustaining grounds.").

[3] The statute authorizing this action, section 48-39-220, is a part of the Coastal Zone Management Act, Title 48, Chapter 39 of the South Carolina Code (2008 & Supp. 2018).  We interpret the provisions of the Act to mean that "marshes" are a subset of "tidelands," which are generally defined in the Act at S.C. Code Ann. § 48-39-10(G) (Supp. 2018) but are also given a distinct definition for purposes of section 48-39-220.  The general definition of tidelands in § 48-39-10(G) is, in pertinent part:

> all areas which are at or below mean high tide and *coastal wetlands*, mudflats, and similar areas that are contiguous or adjacent to coastal waters and are an integral part of the estuarine systems involved.  *Coastal wetlands include marshes*, mudflats, and shallows *and means those areas periodically inundated by saline waters* whether or not the saline waters reach the area naturally or through artificial water courses and those areas that are normally characterized by the prevalence of saline water vegetation capable of growth and reproduction.  Provided, however, nothing in this definition shall apply to wetland areas that are not an integral part of an estuarine system.

(emphases added).  The distinct definition of tidelands for purposes of section 48-39-220 is:  "all lands except beaches in the Coastal zone between the mean high-water mark and the mean low-water mark of navigable waters *without regard to the degree of salinity of such waters*." (emphasis added).

this tract. The other tract, for which Merry Land paid $1.5 million, consists of 10 acres and borders Johnny Morrall Circle and Ribaut Road. Prior to closing on the purchase of these tracts, Merry Land obtained state and federal permits authorizing construction of a community marina.

After Merry Land closed on the purchase of these tracts, it refinanced the loan secured by the property. During the refinancing process, the appraiser employed by Merry Land's lender discovered a notation in the Beaufort County GIS System indicating a tax parcel in the marsh where Merry Land planned to launch the marina.[4] As a result, Merry Land sent a letter to Hoyler, a Rhode Island resident, offering to purchase this property. Rather than accepting the offer, Hoyler filed this action on November 8, 2007, against Respondent State of South Carolina to obtain a declaration that he owned the disputed marsh.

In his complaint, Hoyler asserted the existence of an 1891 deed to his predecessor in title, J.M. Crofut, from former Governor Benjamin R. Tillman for 95.27 acres of marshland located on the Beaufort River. The complaint also asserted that the deed was accompanied by a plat depicting a tract "bounded on the South by lands of Moss, on the West by miscellaneous individuals, on the North by Seal Island Chemical Works[,] and on the East by the Beaufort River." An heir of Crofut, Elizabeth Waterhouse, devised a share of her putative interest in the property to Hoyler in 1968, and in 1979, the remaining heirs conveyed their respective putative interests to Hoyler for $10.

In its answer to the complaint, the State asserted that it held prima facie title to the disputed marsh in trust for the public and Hoyler lacked the power to exclude the public from the marsh. Merry Land filed a motion to intervene in this action as well as an "Answer and Counterclaim" asserting that Hoyler was barred from preventing construction of the planned marina by the doctrines of estoppel and laches. On February 22, 2008, the master, with the consent of counsel for all parties, executed an order granting Merry Land's motion to intervene.[5]

The master conducted a hearing on January 31, 2011, in which he denied Hoyler's subsequent and contrarian motion to dismiss Merry Land from this action and ruled, *sua sponte*, that several additional owners of property adjacent to the

---

[4] Beaufort County assigned a market value of $1,000 to this parcel.

[5] Curiously, the order referring this action to the master was not executed until September 13, 2010.

disputed marsh would be joined as defendants.[6]  In his written order, the master concluded the adjacent property owners were being joined pursuant to Rule 20(a), SCRCP,[7] because they could lose their right of access to the Beaufort River upon a declaration that Hoyler held title to the disputed marsh.  Hoyler filed a motion for reconsideration and a Notice of Appeal.  The motion for reconsideration remained unresolved until after this court dismissed the appeal as interlocutory and our supreme court denied certiorari.  On remand, the master denied Hoyler's motion for reconsideration and granted a motion to intervene filed by Nancy Deering Carey.  Hoyler appealed these rulings, and this court also dismissed the appeal as interlocutory.

Subsequently, Hoyler served all of the adjoining property owners with notice of this action, and the master conducted a hearing on November 19, 2015.  The master allowed the record to stay open for 45 days after the hearing to allow Merry Land to obtain the deposition testimony of a surveyor who had worked with Merry Land's civil engineering expert.  After the master reviewed this deposition testimony, he sent an e-mail to counsel for the parties requesting a proposed order from counsel for Respondents.  In response, Hoyler filed a motion challenging the findings in the master's e-mail pursuant to Rule 59(e), SCRCP.  The master denied this motion in a Form 4 order.

On May 27, 2016, the master issued a written order concluding that the conveyance to Crofut was a valid exercise of the State's authority under the law as it

---

[6] The disputed marsh is contiguous to the Spanish Point subdivision in Port Royal.

[7] Rule 20(a) states, in pertinent part,

> All persons *may* be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.  A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded.  Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

(emphasis added).

existed at the time of the conveyance but the property could not be accurately located and, therefore, Hoyler was not entitled to a declaration that he held title to the disputed marsh. On June 19, 2016, Hoyler filed a second Rule 59(e) motion in response to the written order, and the master denied this motion. This appeal followed.

## ISSUES ON APPEAL

1.     Did the master err by concluding Hoyler was not entitled to a declaration that he held title to 95.27 acres of marshland as against the State?

2.     Did the master err by allowing adjacent property owners to intervene in this action?

3.     Did the master err by concluding the adjacent property owners had standing?

4.     Did the master abuse his discretion by keeping the record open to allow Merry Land to submit additional testimony?

5.     Did the master err by declining to hear post-trial motions in a timely manner?

## STANDARD OF REVIEW

Declaratory Judgment

"A suit for declaratory judgment is neither legal nor equitable, but is determined by the nature of the underlying issue." *Query v. Burgess*, 371 S.C. 407, 410, 639 S.E.2d 455, 456 (Ct. App. 2006) (quoting *Felts v. Richland Cty.*, 303 S.C. 354, 356, 400 S.E.2d 781, 782 (1991)). "To make this determination [the appellate court] look[s] to the main purpose of the action as determined by the complaint." *Id.* (quoting *Estate of Revis v. Revis*, 326 S.C. 470, 476, 484 S.E.2d 112, 115 (Ct. App. 1997)). When the complaint's main purpose "concerns the determination of title to real property, it is an action at law." *Id.*

"In an action at law, '[the appellate court] will affirm the master's factual findings if there is any evidence in the record [that] reasonably supports them.'" *Id.* (quoting *Lowcountry Open Land Tr. v. State*, 347 S.C. 96, 101–02, 552 S.E.2d 778, 781 (Ct. App. 2001)). Further, "[the appellate c]ourt reviews all questions of law de novo." *Fesmire v. Digh*, 385 S.C. 296, 302, 683 S.E.2d 803, 807 (Ct. App. 2009); *see also Clardy v. Bodolosky*, 383 S.C. 418, 425, 679 S.E.2d 527, 530 (Ct. App.

2009) ("Questions of law may be decided with no particular deference to the trial court." (quoting *S.C. Dep't of Transp. v. M & T Enters. of Mt. Pleasant, LLC*, 379 S.C. 645, 654, 667 S.E.2d 7, 12 (Ct. App. 2008))).

Deed Interpretation

"In construing a deed, 'the intention of the grantor must be ascertained and effectuated, unless that intention contravenes some well settled rule of law or public policy.'" *Windham v. Riddle*, 381 S.C. 192, 201, 672 S.E.2d 578, 582 (2009) (quoting *Wayburn v. Smith*, 270 S.C. 38, 41, 239 S.E.2d 890, 892 (1977)). "In determining the grantor's intent, the deed must be construed as a whole and effect given to every part if it can be done consistently with the law." *Id.* at 201, 672 S.E.2d at 583 (quoting *Gardner v. Mozingo*, 293 S.C. 23, 25, 358 S.E.2d 390, 391–92 (1987)). "The intention of the grantor must be found within the four corners of the deed." *Id.* (quoting *Gardner*, 293 S.C. at 25, 358 S.E.2d at 392).

However, "[w]here a deed describes land as it is shown on a certain plat, such plat becomes part of the deed for the purpose of showing the boundaries, metes, courses[,] and distances of the property conveyed." *Hobonny Club, Inc. v. McEachern*, 272 S.C. 392, 397, 252 S.E.2d 133, 136 (1979). "[B]oundaries govern acreage and inaccuracies relating to the area of a tract are generally immaterial." *Brownlee v. Miller*, 208 S.C. 252, 260, 37 S.E.2d 658, 661 (1946). Further, "[i]f this [c]ourt decides that the language in a deed is ambiguous, the determination of the grantor's intent then becomes a question of fact" and evidence may be admitted to show the intent of the parties. *Santoro v. Schulthess*, 384 S.C. 250, 272, 681 S.E.2d 897, 908 (Ct. App. 2009); *see also S.C. Dep't of Nat. Res. v. Town of McClellanville*, 345 S.C. 617, 623, 550 S.E.2d 299, 303 (2001) (applying rules of contract construction to a restrictive covenant in a deed); *id.* at 623, 302–03 ("A contract is ambiguous when the terms of the contract are reasonably susceptible of more than one interpretation. It is a question of law for the court whether the language of a contract is ambiguous. Once the court decides the language is ambiguous, evidence may be admitted to show the intent of the parties. The determination of the parties' intent is then a question of fact." (citations omitted)).

Moreover, "[a] deed or grant by [the State] is construed strictly in favor of the State and general public and against the grantee." *Query*, 371 S.C. at 411, 639 S.E.2d at 456–57 (second alteration in original) (quoting *State v. Hardee*, 259 S.C. 535, 539, 193 S.E.2d 497, 499 (1972)); *accord Estate of Tenney v. S.C. Dep't of Health & Envtl. Control*, 393 S.C. 100, 106, 712 S.E.2d 395, 398 (2011) ("In areas subject to the public trust doctrine, presumption of State ownership 'may be overcome only

by showing a specific grant from the sovereign[,] which is strictly construed against the grantee.'" (quoting *McQueen v. S.C. Coastal Council*, 354 S.C. 142, 149 n.6, 580 S.E.2d 116, 119 n.6 (2003))); *Grant v. State*, 395 S.C. 225, 229, 717 S.E.2d 96, 98 (Ct. App. 2011).

## LAW/ANALYSIS

### I.      Determination of Title

Hoyler argues that the 95.27 acres is readily identifiable from the plat incorporated into the deed to Crofut and, therefore, the master improperly considered extrinsic evidence.  On the other hand, Merry Land contends the intent underlying the deed's incorporation of the plat was to show the boundaries, metes, courses, and distances of the property conveyed but the plat's information was insufficient to identify those features.  Likewise, the State maintains the plat provided insufficient guidance.  We agree with Merry Land and the State.

We begin our analysis with the foundation on which the determination of property rights in tidelands rests, South Carolina's public trust doctrine.  The public trust doctrine provides that lands below the high water mark are presumptively owned by the State and held in trust for the benefit of the public, and it has been a vital part of the jurisprudence of South Carolina and many other states for centuries, even pre-dating the beginning of our republic.[8]  The doctrine rightfully forbids the State from permitting activity substantially impairing the public interest in marine life, water quality, or public access.[9]

> The underlying premise of the Public Trust Doctrine is that some things are considered too important to society to be owned by one person.  Traditionally, these things have included natural resources such as air, water (including waterborne activities such as navigation and fishing), and

---

[8] *See McQueen*, 354 S.C. at 149–50, 580 S.E.2d at 119–20; *Grant*, 395 S.C. at 230–31, 717 S.E.2d at 99–100; *Query*, 371 S.C. at 410–11, 639 S.E.2d at 456; *see also State v. Pac. Guano Co.*, 22 S.C. 50, 55–56 (1884); *Commonwealth v. City of Roxbury*, 75 Mass. 451, 478–79 (1857); Melissa K. Scanlan, *Shifting Sands: A Meta-Theory for Public Access and Private Property Along the Coast*, 65 S.C. L. Rev. 295, 307–13 (2013); William A. Clineburg and John E. Krahmer, *The Law Pertaining to Estuarine Lands in South Carolina*, 23 S.C. L. Rev. 7, 10–24 (1971).
[9] *McQueen*, 354 S.C. at 149–50, 580 S.E.2d at 119–20.

land (including but not limited to seabed and riverbed soils). Under this Doctrine, everyone has the inalienable right to breathe clean air; to drink safe water; to fish and sail, and recreate upon the high seas, territorial seas and navigable waters; as well as to land on the seashores and riverbanks.

*Sierra Club v. Kiawah Resort Assocs.*, 318 S.C. 119, 127–28, 456 S.E.2d 397, 402 (1995) (quoting Greg L. Spyridon and Sam A. LeBlanc, III, *The Overriding Public Interest in Privately Owned Natural Resources: Fashioning a Cause of Action*, 6 Tul. Envtl. L.J. 287, 291 (1993)). In more recent years, our supreme court captured the essence of the doctrine as it applies to tidelands: "Our State's tidelands are a precious public resource held in trust for the people of South Carolina."[10]

It is through this lens that we examine the claim of a private individual to an ownership interest in tidelands, an interest that would allow him to exclude the public. Because the law, as a zealous guardian of the public interest, bestows presumptive ownership of tidelands on the State for the benefit of the public, any deed from the State purporting to convey tidelands to a private individual must be strictly construed against the grantee and in favor of the public.[11] In *State v. Pacific Guano Company*, our supreme court explained,

> In all grants from the government to the subject, the terms of the grant are to be taken most strongly against the grantee, and in favor of the grantor, reversing the rule as between individuals, on the ground that the grant is supposed to be made at the solicitation of the grantee, and the form and terms of the particular instrument of grant proposed by him and submitted to the government for its allowance. But this rule applies *a fortiori* to a case where such grant by a government to individual proprietors is claimed to be not merely a conveyance of title to land[]

---

[10] *Kiawah Dev. Partners, II v. S.C. Dep't of Health & Envtl. Control*, 411 S.C. 16, 22, 766 S.E.2d 707, 710 (2014).

[11] *Query*, 371 S.C. at 411, 639 S.E.2d at 456–57; *accord Estate of Tenney*, 393 S.C. at 106, 712 S.E.2d at 398 ("In areas subject to the public trust doctrine, presumption of State ownership 'may be overcome only by showing a specific grant from the sovereign[,] which is strictly construed against the grantee.'" (quoting *McQueen*, 354 S.C. at 149 n.6, 580 S.E.2d at 119 n.6)); *Grant*, 395 S.C. at 229, 717 S.E.2d at 98.

but also a portion of that public domain [that] the government held in a fiduciary relation[] for general and public use.

22 S.C. 50, 86 (1884).

For this reason, "the party asserting a transfer of title bears the burden of proving its own good title,"[12] and one claiming an interest in tidelands pursuant to section 48-39-220(A) must convince the court that the State intended to include the tidelands within the boundaries expressed in the deed.[13] Necessarily, the claimant must show that the language of the conveyance is specific enough to determine a reasonably precise location of its boundaries so that members of the public will not be excluded from property rightfully belonging to them.[14]

In *Query v. Burgess*, this court affirmed the master's finding that the plat accompanying a 1786 deed to the disputed property near the Folly River was "not sufficiently detailed to rebut the State's presumption of title to land below the high water mark." 371 S.C. at 412, 639 S.E.2d at 457. The court noted that the plat "contain[ed] the bare bones of a survey and [was] neither precise nor detailed." *Id.* The court also concluded that the master "reasonably determined the 1786 grant and accompanying plat did not demonstrate the State's intent to grant title to the marshlands" based on "the absence of terms consonant with granting property below the high water mark, such as 'marsh,' 'marshland,' 'high-water mark,' or 'low-water mark.'" *Id.*

---

[12] *Lowcountry*, 347 S.C. at 103, 552 S.E.2d at 782; *see also State v. Fain*, 273 S.C. 748, 752, 259 S.E.2d 606, 608 (1979) ("[I]t is well settled that the State comes into court with a presumption of title, and, if an individual is to prevail, *he must recover upon the strength of his own title, of which he must make proof*." (emphasis added)).
[13] *See Hobonny Club,* 272 S.C. at 398, 252 S.E.2d at 136–37; *Query*, 371 S.C. at 411, 639 S.E.2d at 456 ("To establish ownership of tidelands or marshlands, a claimant must show (1) the claimant's predecessors in title possessed a valid grant, and (2) the grant's language was sufficient to convey title to land below the high water mark.").
[14] *See Hobonny Club,* 272 S.C. at 398, 252 S.E.2d at 136–37; *Grant*, 395 S.C. at 235–36, 717 S.E.2d at 102 (contrasting the plat to the disputed property with the precise plats in *Hobonny Club* and highlighting expert testimony stating that the plat was "poorly drawn and not capable of being relocated on the ground"); *Query*, 371 S.C. at 411–12, 639 S.E.2d at 456–57.

In contrast, in *Hobonny Club, Inc. v. McEachern*, our supreme court upheld the circuit court's conclusion that the plaintiff had valid title to certain tidelands "embraced within the boundaries of the plats attached to the royal grants . . . ." 272 S.C. at 398, 252 S.E.2d at 137. The court observed, "the failure of the grantor to use 'low water line' in describing the property conveyed was not significant in that the attached plats precisely showed the boundaries of the land granted without the necessity of resorting to words." *Id.* at 398, 252 S.E.2d at 136. The court added,

> [T]he plats in question speak with a precision not usually attainable by mere words, and they compel the conclusion that the grantor intended to include the tidelands encompassed within the perimeters of the plats. *It is difficult to imagine how more precisely to express intent as to the location of boundaries than to incorporate an accurate plat in the description*. The plats incorporated in the two grants to [the plaintiff's predecessor in title] are exceptional. They are not mere maps on which boundary waterways are drawn in free-hand to represent directions and conformations of boundaries. These plats are carefully scaled and platted so as to delineate the boundaries of the tracts granted with mathematical precision. It is undisputed that the boundaries are *accurately relocatable on the ground by contemporary engineering methods*. *The specificity of the attached plats outweigh, in our judgment, the general terms of the descriptions in the grants in determining the intent of the grantor*. We conclude that it was the clear intent of the grants in question to convey title to all tidelands lying *within the perimeter lines of the plats* accompanying the grants to [the plaintiff's] predecessor in title[].

*Id.* at 398, 252 S.E.2d at 136–37 (emphases added); *see also Brownlee*, 208 S.C. at 261, 37 S.E.2d at 662 (affirming the trial court's order dismissing a petition to set aside a judicial sale and adopting the language of the order, which relied, in part, on the sufficiency of the property description "to enable a person of ordinary prudence acting in good faith and making inquiries suggested by the description to enable him to identify the land"); *id.* at 260, 37 S.E.2d at 661 ("[B]oundaries govern acreage and inaccuracies relating to the area of a tract are generally immaterial.").

In *Grant v. State*, this court once again addressed the plat examined in *Query* and specifically noted that "in contrast to the plats in *Hobonny Club*, Grant's expert land surveyor . . . testified the 1786 plat is poorly drawn and *not capable of being relocated on the ground*." 395 S.C. at 236, 717 S.E.2d at 102 (emphasis added). The court concluded that the claimant failed to rebut the State's presumptive title, implicitly acknowledging the claimant's obligation to show the language of the conveyance is specific enough to determine a reasonably precise location of its boundaries. *Id.* at 236, 717 S.E.2d at 102.

While a property description need not be perfect, it must allow one examining it to identify the property conveyed; otherwise, the conveyance is void. *See Blake v. Doherty*, 18 U.S. 359, 362 (1820) ("It is undoubtedly *essential to the validity of a grant*, that there should be a thing granted, which must be so described as to be capable of being distinguished from other things of the same kind." (emphasis added)).

> "A deed is not void for uncertainty, because there may be errors or an inconsistency, in some of the particulars. . . . Generally the rule may be stated to be, that the deed will be sustained, *if it is possible from the whole description, to ascertain and identify the land intended to be conveyed*." In a note to that section it is said: "As that is certain which can be made certain, the description, if it will enable a person of ordinary prudence acting in good faith and making inquiries, *which the description would suggest to him to identify the land*, is sufficient."

*Brownlee*, 208 S.C. at 261, 37 S.E.2d at 662 (emphases added) (alteration in original) (quoting *McNair v. Johnson*, 95 S.C. 176, 179, 178 S.E. 892 (1913)); *see also Lord v. Holland*, 655 S.E.2d 602, 603–04 (Ga. 2008) ("One essential of a deed is that the description of the premises sought to be thereby conveyed must be sufficiently full and definite to afford means of identification." (quoting *Crawford v. Verner*, 50 S.E. 958, 959 (Ga. 1905)); *Katz v. Daughtrey*, 151 S.E. 879, 880 (N.C. 1930) ("If the land intended to be conveyed cannot be identified from the description contained in the deed, it follows as a necessary corollary that as the deed is, for this reason, inoperative, it is equally inoperative as color of title.").

In identifying the land intended to be conveyed, it is permissible to rely on extrinsic evidence if it is necessary to clarify a property description. *See Blake*, 18

U.S. at 362 ("[I]t is not necessary that the grant itself should contain such a description as, *without the aid of extrinsic testimony*, to ascertain precisely what is conveyed." (emphasis added)); *Lord*, 655 S.E.2d at 604 ("While it is not necessary that the instrument should embody a minute or perfectly accurate description of the land, yet it must furnish the key to the identification of the land intended to be conveyed by the grantor." (quoting *Crawford*, 50 S.E. at 959)). However, if it is impossible to locate a key identifier referenced in the deed, the grant is void. *Blake*, 18 U.S. at 362–63. In *Blake*, the plaintiff, who claimed title to certain land through a grant from the State of Tennessee, filed an ejectment action against the defendants, who claimed the land under a patent from the State of North Carolina. *Id.* at 360. The property description in the North Carolina patent designated a hickory tree as the beginning of a survey. *Id.* Using the hickory to illustrate the degree of certainty required in a property description, the Court explained,

> Almost all grants of land call for natural objects which must be proved by testimony consistent with the grant, but not found in it. Cane Creek, and its wes[t] fork, are to be proved by witnesses. So the hiccory which is to constitute the beginning of a survey of a tract of land to lie on the west fork of Cane Creek. *If, in the nature of things, it be impossible to find this hiccory, all will admit the grant must be void.* But if it is not impossible, if we can imagine testimony which will show any particular hiccory to be that which is called for in the grant, then it is not absolutely void for uncertainty, whatever difficulty may attend the location of it.

*Id.* at 362–63 (emphasis added).

Here, the Governor's deed to Hoyler's predecessor in title, J.M. Crofut, employed the terms high water mark and low water mark, but it also incorporated the 1891 plat in conveying "A Plantation or Tract of Vacant Land, situate in Beaufort [illegible] of Beaufort County and State aforesaid containing ninety-five [and] 27/100 (95 27/100) acres, more or less, [b]eing a parcel or tract of land on the Beaufort River in County and State aforesaid and lying between high and low water mark[s] on [the] river above mentioned[,] *having such shape, form[,] and marks as are represented by a Plat of said land on file in the office of the Secretary of State in Book 2 of Public Land Plats, Page 16*." (emphasis added).[15] *See Hobonny Club*, 272

---

[15] The State reserved mineral and phosphate rights to itself.

S.C. at 397, 252 S.E.2d at 136 ("Where a deed describes land as it is shown on a certain plat, such plat becomes part of the deed for the purpose of showing the boundaries, metes, courses[,] and distances of the property conveyed."). The incorporated plat designates specific bearings and distances, some of which are illegible, for the boundary lines.

The plat's illegibility effectively made the deed ambiguous as to the precise location of the 95.27 acres in dispute. Therefore, the master properly considered extrinsic evidence. *See Santoro*, 384 S.C. at 272, 681 S.E.2d at 908 ("If this [c]ourt decides that the language in a deed is ambiguous, the determination of the grantor's intent then becomes a question of fact."); *see also McClellanville*, 345 S.C. at 623, 550 S.E.2d at 303 (applying rules of contract construction to a restrictive covenant in a deed); *id.* at 623, 302–03 ("A contract is ambiguous when the terms of the contract are reasonably susceptible of more than one interpretation. It is a question of law for the court whether the language of a contract is ambiguous. *Once the court decides the language is ambiguous, evidence may be admitted to show the intent of the parties*. The determination of the parties' intent is then a question of fact." (emphasis added) (citations omitted)).

This extrinsic evidence consisted of expert testimony presented at the final merits hearing. First, Hoyler presented the testimony of his expert in land surveying, Lorick Fanning, who provided his opinion regarding identification of the area referenced in the deed to Crofut. Fanning recreated the boundaries of the parcel, relying on field work as well as an 1882 plat that purportedly encompassed the parcel conveyed to Crofut. He established the eastern and western boundaries of the parcel by using the current location of the mean high water and mean low water marks.

Merry Land's land surveying expert, Donald Cook, testified that he examined the 1882 plat and the 1891 plat and noticed the absence of a "scale" and a "point of beginning" or "point of commencement." *Cf. Lord*, 655 S.E.2d at 604 ("The description set forth in plaintiff's deed did not include a beginning point or other specifications enabling one to definitively locate the property to be conveyed. It follows that plaintiff's deed was invalid . . . ." (citations omitted)); *Katz*, 151 S.E. at 880 (holding that a deed purporting to convey twenty-five acres of a fifty-acre tract "without fixing the beginning point or any of the boundaries of the twenty-five acres" was void for vagueness and uncertainty of description because it failed to describe with certainty the property sought to be conveyed, and it contained no reference to "anything extrinsic, which by recourse thereto [wa]s capable of making the description certain"). Cook explained, "without a point of beginning[,] you have . . . no point to start to locate the parcel on the ground. Without a scale[,] you

can't . . . tell . . . what measurement of units they were using. So, therefore, scaling it, you don't know really how big the parcel is or potentially how big it is." *See Brownlee*, 208 S.C. at 260, 37 S.E.2d at 661 (holding that boundaries govern acreage); *cf. Hobonny Club*, 272 S.C. at 394, 252 S.E.2d at 134 (noting the plat annexed to the deed was drawn to a scale of one inch to twenty chains); *State v. Holston Land Co.*, 272 S.C. 65, 67, 248 S.E.2d 922, 924 (1978) (same).

Merry Land also presented the deposition testimony of a second surveyor, Jim Gardner. Gardner analyzed the 1882 and 1891 plats with the assistance of a computer assisted drafting (CAD) technician in entering the plats' bearings and distances into the CAD program. He concluded the bearings and distances that they *could* discern had shortcomings creating a degree of uncertainty exceeding the allowed tolerance for error, and there were certain bearings and distances that were illegible. In particular, Gardner explained one of the standards for professional surveyors that requires "mathematical closure of surveys," i.e., making the boundary lines "come back together," and described the tolerance for error in the following manner: "anything less than a 1-to-10,000 closure should be dismissed."

Gardner also explained, "if you have a break in the survey, it's not going to close mathematically to any effect, which means . . . it's kind of floating out there." He continued,

> the plat not closing, not coming back together, in other words, if you started at a point, you're supposed to come around and end at the starting point. This survey, if it didn't do that, then everything could be shifted one way or the other. And you wouldn't know where these corners were, truly, without . . . other surveys specifying adjoining corners or adjacent boundaries.

Cook's testimony concerning the failure to close was consistent with Gardner's testimony: "It means that the points are just kind of hanging out there in space." As to the intent of the surveyor who created the 1882 and 1891 plats, Gardner stated that the absence of the terms "mean high water" or "mean low water" indicated that the surveyor's intent was to designate the acreage by bearings and distances on the plat.

In reaching his determination that the property could not be accurately located, the master concluded that Hoyler's "efforts to recreate the 1882 plat and the conveyance to Crofut [were] unreliable." Whereas Hoyler relied on natural

monuments "utilizing mean high and mean low water to reflect high and low water as stated in the [deed]," the plats did not "rely on natural monuments and instead articulate[d] specific directions in express bearings and distances." The master found that the deed's "express reference to the 1891 plat" and the plat's specificity overrode the use of mean high water and mean low water to fix the location of Hoyler's property.

The master also concluded, "Since the plat references a surveyed boundary, replication of the plat should, in the first instance, be based on the surveyed boundary instead of a natural boundary." The master noted that Fanning erred in replicating the 1891 plat "by relying on 'Mean High Water' and 'Mean Low Water' when the [deed] only refer[red] to 'high' and 'low' water" and did not identify high and low water as the parcel's boundaries. We agree with the master's assessment of Fanning's testimony as having negligible probative value because he did not use the plat's bearings and distances for all of the boundary lines—rather, he "relied on [the] mean high and mean low water mark[s] for the eastern and western boundaries[] and extrapolated the north-westerly property corner." *See Fletcher v. Med. Univ. of S.C.*, 390 S.C. 458, 463, 702 S.E.2d 372, 374 (Ct. App. 2010) ("The probative value of expert testimony stands or falls upon an evidentiary showing of the facts upon which the opinion is, or must logically be, predicated." (quoting *Ward v. Epting*, 290 S.C. 547, 563, 351 S.E.2d 867, 876 (Ct. App. 1986))); *see also Blake*, 18 U.S. at 364, 367 (reversing a judgment for the defendants on the ground that the trial court improperly instructed the jurors they could use a private survey "made by direction of a party interested under the grant" for the purpose of "ascertaining the land contained in the grant under which the defendants claimed").

We consider all of this evidence within the confines of a narrow scope of review, an obligation to defer to the fact finder's assessment of witness credibility, and longstanding precedent requiring construction of the State's purported conveyance of tidelands against the grantee. *Query*, 371 S.C. at 411, 639 S.E.2d at 456–57 ("A deed or grant by [the State] is construed strictly in favor of the State and general public and against the grantee." (quoting *Hardee*, 259 S.C. at 539, 193 S.E.2d at 499)); *see also Lollis v. Dutton*, 421 S.C. 467, 483, 807 S.E.2d 723, 731 (Ct. App. 2017) ("[T]he credibility of testimony is a matter for the finder of fact to judge." (quoting *S.C. Dep't of Soc. Servs. v. Forrester*, 282 S.C. 512, 516, 320 S.E.2d 39, 42 (Ct. App. 1984)); *id.* ("In a bench trial, the judge, as the finder of fact, may believe all, some, or none of the testimony, even when it is not contradicted."); *id.* ("Because the appellate court lacks the opportunity for direct observation of the witnesses, it should accord great deference to [circuit] court findings where matters

of credibility are involved." (alteration in original) (quoting *Forrester*, 282 S.C. at 516, 320 S.E.2d at 42)).

We cannot ignore the testimony of Donald Cook and Jim Gardner supporting the master's finding that the deed to Crofut and the 1891 plat it incorporated were insufficient to convey title to a defined location of marsh bordering the Beaufort River. *See Blake,* 18 U.S. at 362 ("It is undoubtedly *essential to the validity of a grant,* that there should be a thing granted, which must be so described as to be capable of being distinguished from other things of the same kind." (emphasis added)); *Brownlee*, 208 S.C. at 261, 37 S.E.2d at 662 (holding a deed will be sustained if "it is possible from the whole description, to ascertain and identify the land intended to be conveyed"); *cf. id.* (noting that the surveyors in that case had no trouble in locating the land).

Therefore, we are compelled to affirm the master's finding. *See Query*, 371 S.C. at 410, 639 S.E.2d at 456 ("In an action at law, '[the appellate court] will affirm the master's factual findings if there is any evidence in the record [that] reasonably supports them.'" (quoting *Lowcountry*, 347 S.C. at 101–02, 552 S.E.2d at 781)).

## II.    Intervention and Joinder

Hoyler also argues the master erred by allowing Merry Land and the other adjacent property owners to "intervene in the action" because they did not claim an interest in tidelands, their boundary lines would not change as a result of the action, and therefore, they had no interest in the outcome. Hoyler maintains that section 48-39-220 allows the participation of only those parties "claiming a 'right, title[,] or interest' below the high-water mark." We disagree with this reasoning.

Rule 24, SCRCP, states, in pertinent part,

> **(a)    Intervention of Right.** Upon timely application anyone *shall* be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction [that] is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

**(b)  Permissive Intervention.**  Upon timely application anyone *may* be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . .  In exercising its discretion[,] the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

(emphases added).

Here, the master executed a consent order allowing Merry Land to intervene in this action.  The consent order does not reference Rule 24, and the motion to intervene, which was served with Merry Land's answer and counterclaim, is not in the record.  The order states, in pertinent part, "this [c]ourt was advised that [Hoyler] . . . [does] not object to intervention but reserve[s] any claims and defenses that [he] may have as to [Merry Land]."  Subsequently, Hoyler sought to dismiss Merry Land from the action on the ground that it did not have standing.  The master denied this motion.

As to the other adjacent property owners, the master, *sua sponte*, invoked Rule 20(a) to join them as defendants because they could lose their right of access to the Beaufort River upon a declaration that Hoyler held title to the disputed marsh.  As we previously stated, Rule 20(a), entitled "Permissive Joinder," provides, in pertinent part,

All persons *may* be joined in one action as defendants *if there is asserted against them* jointly, severally, or in the alternative, *any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.*  A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded.  Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

(emphases added).

Here, Hoyler's complaint references the dock construction permit obtained by one of the adjacent property owners.  The complaint seeks not only a declaration that Hoyler owns the disputed marsh but also a declaration that he "possesses all rights of a fee simple property owner[,] *including the right to exclude dock construction*." (emphasis added).  This language asserts a right to relief arising out of the then-existing and possible future dock construction by adjacent property owners.  Further, the legal question of ownership of the disputed marsh was a question that was common to all of the defendants.  Hoyler's complaint called into question not only the State's competing claim of ownership but also the rights of adjacent property owners to use the marsh to access the Beaufort River and their eligibility to build docks originating from their respective lots and extending into the disputed marsh.[16] If the master had granted Hoyler's request for a declaration that he had the right to exclude dock construction, the rights of the joined parties to access the river or to build in the disputed marsh would have been extinguished.  Therefore, the master properly joined the adjacent property owners as defendants in this action.

Turning back to Merry Land's participation in this action, the master was authorized to allow intervention under Rule 24(b),[17] which states,

> anyone *may* be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when *an applicant's claim or defense and the main action have a question of law or fact in common*. . . .  In exercising its discretion[,] the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

(emphases added).  This standard is similar to the standard for permissive joinder under Rule 20(a), and Merry Land is similarly situated to the other adjacent property

[16] Included in the master's list of thirty-two adjacent property owners is one owner who was ineligible to build a dock due to insufficient frontage.  Eight neighboring owners were listed as eligible for a community dock, and the remaining adjacent owners had sufficient frontage for singular docks.

[17] Hoyler argues none of the adjacent property owners could intervene under Rule 24(a), which governs mandatory intervention.  However, there is nothing in the record indicating the master or Merry Land invoked Rule 24(a) in support of intervention.  Because the master was authorized to allow permissive intervention under Rule 24(b), we need not consider Hoyler's arguments concerning Rule 24(a).

owners. Merry Land has already obtained a permit to build a community marina in the disputed marsh. Because the permit depends on the State's ownership of the disputed marsh, a declaration favoring Hoyler's ownership would extinguish Merry Land's right to build the marina or otherwise access the Beaufort River. As a result, Merry Land asserted that the doctrines of estoppel and laches barred Hoyler from excluding marina construction in the marsh. Therefore, the legal question of ownership of the disputed marsh was common to both Hoyler's action and Merry Land's assertions.

Further, Merry Land's intervention has not caused any undue delay or unfairly prejudiced the master's determination of the merits of Hoyler's claim to ownership. Hoyler himself unnecessarily delayed the case by seeking review of two unappealable interlocutory orders. Moreover, the master's decision to hold the record open for 45 days to allow Merry Land to obtain deposition testimony caused only minimal delay. Additionally, the inadequacy of the information in the deed and plat provided to Hoyler's predecessor in title would have defeated Hoyler's ownership claim even if Merry Land had not intervened in the action.

Based on the foregoing, the master properly denied Hoyler's motion to dismiss Merry Land from the action.

## III. Standing

Hoyler further argues the master erred by allowing the joined parties to continue to participate in the trial because they lacked standing. We disagree.

"Standing refers to [] '[a] party's right to make a legal claim or seek judicial enforcement of a duty or right.'" *Powell ex rel. Kelley v. Bank of Am.*, 379 S.C. 437, 444, 665 S.E.2d 237, 241 (Ct. App. 2008) (second alteration in original) (quoting Black's Law Dictionary 1413 (7th ed. 1999)). "Standing is . . . that concept of justiciability that is concerned with whether a particular person may raise legal arguments or claims." *Id.* (quoting 1A C.J.S. *Actions* § 101 (2005)). "It concerns an individual's 'sufficient interest in the outcome of the litigation to warrant consideration of [the person's] position by a court.'" *Id.* (alteration in original) (quoting 1A C.J.S. *Actions* § 101 (2005)).

Standing consists of the following elements:

First, the plaintiff must have suffered an 'injury in fact'—
an invasion of a legally protected interest which is (a)

concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical'.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

*Sea Pines Ass'n for Prot. of Wildlife, Inc. v. S.C. Dep't of Nat. Res.*, 345 S.C. 594, 601, 550 S.E.2d 287, 291 (2001) (alterations in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *accord Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 407 S.C. 67, 75, 753 S.E.2d 846, 850 (2014).

Here, Merry Land's asserted injury-in-fact is its inability to move forward with its development plans despite its considerable investment of time and money to (1) ensure the property it ultimately purchased could support a mixed-use development and marina; (2) obtain government approvals for construction of the development; and (3) obtain federal and state permits for marina construction.  In fact, Merry Land delayed closing its purchase of the property until it obtained the permits authorizing marina construction due to its cognizance of the value the real estate market places on deep water access.  This injury is clearly "concrete and particularized" and "actual," rather than "conjectural" or "hypothetical."  *See Sea Pines*, 345 S.C. at 601, 550 S.E.2d at 291 (setting forth the first element of standing).

With title to the disputed marsh brought into doubt by Hoyler's filing of this action, Merry Land's development project has remained in limbo, preventing Merry Land from realizing any return on its investment.  *See id.* (describing the second element of standing as a "causal connection between the injury and the conduct complained of").  A decision favoring Hoyler would effectively void the marina permit and result in Merry Land's loss of access over the disputed marsh to the river.  The State would no longer have the authority to manage these tidelands for public use or to permit adjacent property owners to build docks in these tidelands.  Further, there is no realistic expectation that Hoyler would give Merry Land permission to build in the disputed tidelands given his request for a declaration that he can exclude dock construction.  *See* S.C. Code Ann. Regs. 30-2(I)(4) (2011) (providing that if a decision in an action under section 48-39-220 determines that the plaintiff owns the disputed tidelands and has a right to exclude others, a critical area permit will not be issued unless "the applicant presents the Department with a copy of a deed, lease, or

other instrument from the adjudicated critical area landowner that would allow construction of the proposed project[] or written permission from such owner to carry out the proposal").

On the other hand, a decision favoring the State redresses Merry Land's injury-in-fact by validating not only the State's title to the disputed marsh but also the federal and state permits allowing Merry Land to move forward with its development plans.  *See Sea Pines*, 345 S.C. at 601, 550 S.E.2d at 291 (setting forth the third element of standing:  "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'").

Similarly, the other adjacent upland property owners were injured by Hoyler's action.  Those who had not yet built docks were unable to begin that process without the risk of losing their financial investment upon having to remove them later. Further, those who had already built docks would have had to remove them upon a ruling favorable to Hoyler.  Moreover, all of the adjacent owners would have lost access to the Beaufort River upon a ruling favorable to Hoyler.  These injuries were clearly "concrete and particularized" and "actual or imminent," rather than "conjectural" or "hypothetical," and they resulted from Hoyler's filing of this action. *See id.* (setting forth the first element of standing and describing the second element of standing as a "causal connection between the injury and the conduct complained of"); *cf. Ogburn-Matthews v. Loblolly Partners (Ricefields Subdivision)*, 332 S.C. 551, 565, 505 S.E.2d 598, 605 (Ct. App. 1998), *overruled on other grounds by Brown v. S.C. Dep't of Health & Envtl. Control*, 348 S.C. 507, 560 S.E.2d 410 (2002) (holding the appellant's claim of an individual injury in the adverse effect of a certificate of consistency on her use and enjoyment of a wetland adjacent to her residence was sufficient to provide standing); *S.C. Wildlife Fed'n v. S.C. Coastal Council*, 296 S.C. 187, 190, 371 S.E.2d 521, 523 (1988) (holding several environmental groups' allegations of an individualized injury in the adverse effect of a Coastal Council decision on their members' use and enjoyment of wetlands' fish and wildlife were sufficient to show standing).

In other words, the State would no longer have the authority to manage the disputed marsh for public use or to permit adjacent property owners to build in the marsh, and Hoyler has explicitly indicated an intent to exclude dock construction upon a ruling in his favor.  On the other hand, a decision favoring the State redresses the adjacent owners' injuries by validating the existing dock permits and the State's authority to grant future dock permits.  *See Sea Pines*, 345 S.C. at 601, 550 S.E.2d at 291 (setting forth the third element of standing:  "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'").

Based on the foregoing, Merry Land and the other adjacent property owners had a "sufficient interest in the outcome of the litigation to warrant consideration of [their] position by a court." *Powell*, 379 S.C. at 444, 665 S.E.2d at 241 (quoting 1A C.J.S. *Actions* § 101 (2005)). Therefore, the master properly allowed these defendants to participate in this action.

## IV.   Additional Testimony

Hoyler maintains the master erred by granting Merry Land's request to keep the record open to allow it to submit the testimony of its surveyor. Hoyler argues the master effectively granted a continuance that was not authorized by Rule 40(i)(2), SCRCP. We disagree.

Rule 40(i), SCRCP, governs continuances and states,

> **(1) <u>For Cause.</u>** As actions are called, counsel may request that *the action* be continued. If good and sufficient cause for continuance is shown, the continuance may be granted by the court. Ordinarily such continuances shall be only until the next term of court. Each scheduled calendar week of circuit court shall constitute a separate term of court.
>
> **(2) <u>For Absence of Witness.</u>** No motion *for continuance of trial* shall be granted on account of the absence of a witness without the oath of the party, his counsel or agent, to the following effect, to wit: That the testimony of the witness is material to the support of the action or defense of the party moving; that the motion is not intended for delay; but is made solely because the party cannot go safely to trial without such testimony; that there has been due diligence to procure the testimony of the witness or of such other circumstances as will satisfy the court that the motion is not intended for delay. . . . A party applying for such postponement on account of the absence of a witness shall set forth under oath in addition to the foregoing matters what fact or facts he believes the witness if present would testify to, and the grounds for such belief.

(emphases added).

However, once a trial begins, "[t]he conduct of trial, including the admission and rejection of testimony, is largely within the trial judge's sound discretion, the exercise of which will not be disturbed on appeal absent an abuse of that discretion or the commission of legal error that results in prejudice for the appellant." *S.C. Dep't of Highways & Pub. Transp. v. Galbreath*, 315 S.C. 82, 85, 431 S.E.2d 625, 628 (Ct. App. 1993). "An abuse of discretion occurs when the judge issuing the order was controlled by some error of law or when the order, based upon factual, as distinguished from legal conclusions, is without evidentiary support." *Sundown Operating Co. v. Intedge Indus., Inc.*, 383 S.C. 601, 607, 681 S.E.2d 885, 888 (2009). Further, "[t]o warrant a reversal based on the admission of evidence, the appellant must show both error and resulting prejudice." *Conway v. Charleston Lincoln Mercury Inc.*, 363 S.C. 301, 307, 609 S.E.2d 838, 842 (Ct. App. 2005).

At the November 2015 hearing, Merry Land presented the testimony of Gregory Baisch, a civil engineer employed with Ward Edwards Engineering. Baisch testified that he asked the Ward Edwards survey staff to attempt to close the boundaries of the 1882 and 1891 plats. However, the master sustained Hoyler's objections to Baisch attempting to recount the surveyors' investigation and determinations. At the conclusion of Baisch's testimony, Merry Land moved to keep the record open after the hearing to allow it to locate the surveyor who worked with Baisch, Jim Gardner, and obtain his deposition testimony. The master granted the motion, allowing the record to stay open for 45 days and requiring subsequent post-trial briefs.

The master's ruling did not constitute a continuance as contemplated by the language of Rule 40. With the exception of Gardner's deposition testimony, the master conducted a full bench trial upon remand from Hoyler's unsuccessful, years-long, interlocutory appeals. Hoyler has not shown that he was unfairly prejudiced by the record staying open for a mere 45 days after trial. Hoyler participated in the deposition and had the opportunity to submit a post-trial brief after the deposition. Further, he does not allege in his appellate brief that the slight post-trial delay unfairly prejudiced him.

Based on the foregoing, the master acted within his discretion in allowing the record to remain open to allow Merry Land to submit Gardner's testimony. *See Galbreath*, 315 S.C. at 85, 431 S.E.2d at 628 ("The conduct of trial, including the admission and rejection of testimony, is largely within the trial judge's sound discretion, the exercise of which will not be disturbed on appeal absent an abuse of that discretion or the commission of legal error that results in prejudice for the

appellant."); *Conway*, 363 S.C. at 307, 609 S.E.2d at 842 ("To warrant a reversal based on the admission of evidence, the appellant must show both error and resulting prejudice.").

## V.     Post-trial Motions

Hoyler's final argument is that the master erred by "refusing to hear post-trial motions in a timely manner."  This issue is unpreserved because Hoyler's supporting discussion is conclusory and cites no authority.  *See S.C. Dep't of Soc. Servs. v. Mother ex rel. Minor Child*, 375 S.C. 276, 283, 651 S.E.2d 622, 626 (Ct. App. 2007) (noting an issue was abandoned because the appellant made a conclusory argument without citation of any authority to support her claim).

In any event, the record does not support Hoyler's assertion that the master refused to hear any "post-trial motions."  The master gave all parties the opportunity to submit post-trial briefs, and they took advantage of this opportunity.  *See supra* section IV.  Further, to the extent Hoyler is arguing that the master did not properly consider his Rule 59(e) motions, neither Hoyler's e-mail request to "make [his] post trial motions for the record" nor his request for "guidance as to Post-Trial Motions" communicated a request for a hearing on a motion for reconsideration, especially given the fact that the requests pre-dated the master's announcement of his decision. Therefore, we reject Hoyler's argument that the master refused to timely consider his post-trial motions.

## CONCLUSION

Based on the foregoing, we affirm the master's order.

**AFFIRMED.**

**WILLIAMS and HILL, JJ., concur.**